## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| GOVERNMENT EMPLOYEES' RETIREMENT SYSTEM OF THE VIRGIN ISLANDS, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 1981-5 |
| v. | ) ) | |
| KIRK CALLWOOD,[1] Commissioner of Finance, THE GOVERNMENT OF THE VIRGIN ISLANDS | ) ) ) ) | |
| Defendants. | ) ) | |

**ATTORNEYS:**

**Cathy M. Smith**
Government Employees Retirement System
St. Thomas, U.S.V.I.
*For the Government Employees' Retirement System of the Virgin Islands,*

**Robert David Klausner**
Klausner, Kaufman, Jensen & Levinson
St. Thomas, U.S.V.I.
*For the Government Employees' Retirement System of the Virgin Islands,*

**Denise N. George, AG**
**Carol Thomas-Jacobs, AAG**
St. Thomas, U.S.V.I.
*For Kirk Callwood and the Government of the Virgin Islands,*

**Elliot H. Scherker**
**Angel Taveras**
Boston MA and Miami, FL
*For Kirk Callwood and the Government of the Virgin Islands.*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the caption of this matter was changed to reflect the substitution of the current Commissioner of Finance as a party.

## ORDER

**GÓMEZ, J.**

Before the Court is the motion of the Government Employees'
Retirement System to enforce the Consent Judgment in this
matter.

## I.   FACTUAL AND PROCEDURAL HISTORY

In 1959, the Government of the Virgin Islands ("GVI")
established "a retirement and benefit system for officials and
employees of the [GVI]." *See* 3 V.I.C. § 701. The GVI created the
Government Employees' Retirement System of the Virgin Islands
("GERS") to administer that retirement and benefit system. *See
id.*

The funds of the retirement system "are those of [GERS] and
not those of the [GVI]." *See* 3 V.I.C. § 701(c). The retirement
system is financed through "contributions by members,
contributions by the employer, interest income, and other income
accruing to [GERS]." 3 V.I.C. § 718(a) All members contribute a
statutorily determined percentage of their compensation to GERS
"in the form of a deduction from compensation" (the "employee
contribution"). *See* 3 V.I.C. § 718(b)-(c). A given employee's
contribution is deducted by the GVI from that employee's
compensation. As the contribution is not the property of the

GVI, the GVI merely serves as a conduit through which an employee's contribution passes. The GVI, on behalf of the employee, is obligated to remit the employee's contribution to GERS.

In addition to remitting employee contributions to GERS, the GVI has several other responsibilities with respect to funding GERS. Specifically, the GVI must contribute a statutorily determined amount based on "a percentage of employees' compensation for pay periods" (the "employer contribution"). 3 V.I.C. § 718(g). The GVI is also required to "make contributions[,] which together with the members' contributions and the income of the system[,] will be sufficient to provide adequate actuarially determined reserve for the annuities, benefits and administration of [GERS]" (the "actuarially determined employer contribution" or "ADEC"). 3 V.I.C. § 718(f). This amount is determined by an "an annual actuarial valuation and appraisal" prepared by GERS. 3 V.I.C. § 718a(a).

On January 6, 1981, the GERS filed a complaint in this Court. GERS alleged that the GVI was failing to remit the required employee and employer contributions to GERS on a timely basis. On December 10, 1984, this Court entered a consent decree

intended to resolve the dispute between the GVI and GERS (the "Consent Judgment").

Pursuant to the Consent Judgment, the Court ordered the GVI to, "within thirty (30) days of each payroll period, certify and pay into the Employees' Retirement System Fund the total amount due of employee and employer contributions." *See* ECF No. 2, Ex.3 at 1. The Court ordered the GVI to pay within 60 days any contributions that were more than thirty days past due as of the date of the judgment. The Court noted that it "d[id] not have jurisdiction to compel the payment of the legal rate of interest . . . on [delinquent] . . . contributions." *Id.* at 2. The Court indicated, however, that, "if an act is established by the Legislature, authorizing the payment of interest, this Consent Judgment shall be amended to reflect such change." *Id.*

In 1994, GERS alleged that, since the Consent Judgment had been entered, the GVI had been making required payments to GERS "between six and ten weeks following each payroll period." *Employee Ret. Sys. of Gov't of Virgin Islands v. Quinn*, No. CIV. 81-5, 1994 WL 326224, at *1 (D.V.I. June 9, 1994). To remedy this and several other issues, the GVI and GERS stipulated to the entry of a modified consent judgment, which "outline[d] with greater specificity the obligations of the parties." *Id.* at *3.

On April 25, 1994, the Court entered a modified consent judgment (the "Modified Consent Judgment").

The Modified Consent Judgment ordered that an interest bearing bank account be established in the name of GERS within sixty days of the date of the judgment. The GVI was ordered to "deposit all employer and employee contributions, cash, loan payments, interest and all other monies received of every kind and description belonging to [GERS] ('System Receipts') . . . within twenty-one (21) days of the payroll period for which the contributions and other receipts are collected." ECF No. 14, Ex. 1 at 1.

The Court also ordered GERS to complete audits of the "net assets available for pension benefits . . . as of September 30, 1992, and September 30, 1993." *Id.* at 2. These audits were to be completed no later than October 15, 1994. Te GERS was further ordered "to prepare an analysis of all cash belonging to [GERS] held or managed by the Department of Finance for each year beginning October 1, 1987[,] and for each year thereafter up to and including the year ending September 30, 1993." *Id.* This analysis was ordered to be completed by August 15, 1994. Copies of the audit findings and reports and the analysis were to be filed with the Court within five days of their completion.

If the Court determined that money belonging to GERS was held by the GVI, those funds "including accrued interest" were to be "credited to and deposited in the [GERS bank account]." *Id.* at 3. Interest on those owed funds would accrue from the date of the Modified Consent Judgment "until such time as the total amount of [GERS] monies in the possession of the [GVI] are paid into the [GERS bank account]." *Id.* at 4.

On May 6, 1994, the Court entered an addendum to the Modified Consent Judgment (the "Addendum"). The Addendum ordered the GVI to, "based upon its own internal records, determine the amount of [GERS] cash that is being held, as of September 30, 1993, by the Department of Finance and submit this data to the Court within five . . . days of the date this data is received by the [GERS]." ECF No. 14, Ex. 2 at 1. The Addendum further ordered that, if there was "no gross disparity between the amounts" the GVI and GERS determined GERS was owed, GERS was to direct the GVI "to deposit seventy-five . . . percent of the lower of the two amounts into the [GERS] bank account within thirty . . . days of the date such directive is given." *Id.* at 1-2.

On October 17, 2016, GERS filed a motion to enforce the Consent Judgment and Modified Consent Judgment. GERS argued that under the Consent Judgment and the Modified Consent Judgment,

the GVI agreed to make actuarially determined employer contributions to GERS. GERS asserted that the GVI has failed to make those payments.

On March 20, 2017, GERS filed a motion captioned "Emergency Motion for Relief Relating to Withheld Employer and Employee Contributions." *See* ECF No. 20. In that motion, GERS asserted that beginning in December of 2016, the GVI had ceased making timely employee and employer contributions to GERS. Since that time, the GVI has "sporadically forwarded some contributions, but not all, apparently using that money in the interim for other governmental purposes." *Id.* at 2.

On March 13, 2018, the Court held an evidentiary hearing in this matter. During that hearing, the GVI admitted that it had failed to make timely payments as required under Sections 718(b) and (g). At the conclusion of that hearing the Court granted the motion of GERS to enforce the consent judgment in part. In that Order, the Court stated:

> [T]he Government of the Virgin Islands is in breach of the Consent Judgment and Modified Consent Judgment for its failure to timely remit to the Government Employees' Retirement System the payments required by 3 V.I.C. § 718(b) and 3 V.I.C. § 718(g) . . . .
> [N]o later than 3:00 P.M. on March 20, 2018, the parties shall file proposals suggesting effective remedies for the breach that achieve the objectives of the Consent Judgment and Modified Consent Judgment.

ECF No. 49 at 2.

Subsequently, the parties "were able to agree on the principal amount of employer and employee contributions as set forth in 3 V.I.C. § 718(b) and (g) . . . due to GERS." *GVI Brief*, ECF No. 53 at 1. The GVI agreed to pay the outstanding amount over a period of four months, while continuing to make timely employer and employee contributions. *Id.* at 2. The parties agreed that $35,845,597.64 was due to GERS. As support for this number, the parties submitted a spreadsheet entitled "Outstanding Contributions and Loan Deductions." ECF No. 54. That spreadsheet spans June 10, 2017, to June 9, 2019. The spreadsheet reflects a 12 pay-period time where no payment was made by the GVI to GERS for 8 pay periods. *Id.* By June 13, 2018, the amount owed to GERS was $8,146,218.85. That amount was completely paid off before the September, 2018, hearing.

At a November 2018, hearing, GERS presented evidence of earlier employer and employee contributions that the GVI had failed to pay GERS. Austin Nibbs ("Nibbs") testified that the amount of "prior period missing employer contributions [is] approximately $31.5 million." ECF No. 114 at 33. According to Nibbs, the missing payments are not the same as the $35,845,597.64 that was due to GERS, but rather represent prior

instances where the GVI was required to contribute some amount of money for an employer or employee contribution, but had contributed less than that amount. *Id.* at 43-44. The missing payments "go back years and are still outstanding." *Id.*

At the end of that hearing, the Court ordered GERS to file a report with the Court "detailing the cumulative amount of the statutorily determined employer and employee contributions that were required to be deposited by the GVI, on behalf of all government employees, into the Government Employees' Retirement System up to November 15, 2018." ECF No. 104. The Court further ordered the GVI to "file its response to the report produced by GERS." *Id.*

At a February 25, 2019, hearing, GERS presented evidence that the Government of the Virgin Islands had failed to make certain employer and employee contribution payments required under 3 V.I.C. § 718(b) and (g). GERS reported that there was $72,228,214.50 in missing employer contributions and $40,264,935.90 in missing employee contributions as of December 31, 2017. The GVI did not present its own calculation of missing employer and employee contributions. However, the GVI called into question the validity and reliability of the information GERS relied on in calculating the missing employer and employee contributions.

On June 21, 2019, the Court appointed RSM US LLP ("RSM") as

the Court's expert. In that order, the Court noted that GERS

claimed that the GVI owed GERS $66,799.89 in employer

contributions and $37,965.43 in employee contributions. The GVI

claimed it did not owe GERS any money. To resolve this dispute,

the Court appointed RSM and

> tasked [it] with conducting a study to determine what
> employer and employee contributions ought to have
> been paid to GERS under 3 V.I.C. 718 (b) and (g)
> through December 31, 2018 on behalf of all active
> and inactive employees in GERS as of December 31,
> 2018, covering the entire period of plan membership
> until termination of employment.

ECF No.148 at 3. The Court further directed that

> RSM's study shall calculate the amount of any
> employer and employee contributions that were due to
> GERS under 3 V.I.C. 718 (b)and (g) through December
> 31, 2018, on behalf of all active and inactive
> employees in GERS as of December 31, 2018, covering
> the entire period of plan membership until
> termination of employment, that remain unpaid.

*Id.* at 3-4. Ultimately, RSM examined two time periods, the

period of January 1, 2010, through December 31, 2018 (the "2010-

2018 period") and January 1, 1991, through December 31, 2009

(the "1991-2009 period").

On January 29, 2020, RSM filed its final report calculating

unpaid contributions for the 2010-2018 period (the "2010-2018

Report"). RSM determined that the GVI owed GERS between

$4,006,650 and $4,990,749 in employer contributions for the
sample period. RSM also determined that there are about $2.2
million in unpaid employee contributions. This amount was not
included in the estimate, however, because the payment records
were incomplete, and often employee payments are made
independent from the GVI.

On February 5, 2020, the Court held a hearing in this
matter. During that hearing, a representative from RSM testified
that RSM had "concluded that $5 million was owed from the GVI to
GERS." ECF No. 234 at 12:23-24. At the conclusion of the
hearing, the Court adopted RSM's final report and ordered the
GVI to pay GERS $5 million in employer contributions, *see* ECF
No. 234 at 68:14-17 ("And what . . . [RSM's] work and th[eir]
process has yielded is clearly a number that the Court also
finds reliable, and that number is $5 million."), which the
Court ordered the GVI to pay no later than March 5, 2020.

The Court cautioned that this was only a "partial award"
and that several issues were left unresolved. ECF No. 221 at
3:12-13. First, the Court did not determine whether the GVI owed
GERS $2.2 million in unpaid employee contributions. The Court
also delayed ruling on whether the GVI would owe GERS interest
on the $5 million. To that end, the Court ordered the parties to

file briefs addressing whether interest is owed, and if so, in
what amount.

On February 13, 2020, the parties submitted a joint
stipulation. In that stipulation, the GVI and GERS both
"agree[d] that at this time there is no evidence to determine .
. . that the Government withheld any of the $2.2 million in
employee obligations from employee paychecks and did not forward
to GERS." ECF No. 225 at 2. GERS also indicated that it "does
not seek the $2.2 million referenced in the RSM Initial Scope
Report." *Id.*

On February 26, 2020, the parties submitted briefs with
respect to the issue of interest on missing employer
contributions. Both parties acknowledged that, under 3 V.I.C. §
704 ("Section 704"), late payments were subject to "a delinquent
fee of 1.5% for each calendar month" and, following a GERS
Benefits Division invoice, "an additional assessment of 1.0%"
for each month a payment is not made. *See* 3 V.I.C. § 704(q). In
addition, the parties acknowledged that, under 3 V.I.C. § 736
("Section 736"), "interest . . . accrue[d] on the amount of the
contributions not paid based on the [GER]'s domestic fixed
income investment rate of return not to exceed the rate of 9%."
*See* 3 V.I.C. § 736(b). The GVI argues that this interest was not

mandatory, and was waivable by the Court. GERS argues that this interest is mandatory and not waivable.

On March 9, 2020, the Court held a hearing in this matter. At the hearing, a representative from RSM, Chris Fitzgerald ("Fitzgerald"), testified that RSM was able to determine what amount was deficient for each month within the 2010-2018 period. With respect to the 1.5% delinquent fee under Section 704, Fitzgerald testified that RSM had calculated that the GVI owed GERS $5,096,511 for the 2010-2018 period. Fitzgerald was not aware of any "Benefits Division invoice[s]" that had been provided to the GVI and was unable to calculate the 1% additional delinquent assessment under Section 704.

With respect to the interest under Section 736, Fitzgerald testified that the parties were in disagreement over the appropriate rate of interest. For this reason, RSM calculated the Section 736 interest in three different ways. First, RSM used the United States Treasury 10-year treasury bonds daily rates for the relevant time period and applied those rates on a daily basis as though they were a variable daily interest rate, and compounded it daily. The calculation using these rates yielded interest in the amount of $700,000. Second, GERS had informed RSM that 6% was the appropriate rate for the interest under Section 736. Using that rate, RSM calculated interest in

the amount of $2,100,000. Third, the GVI suggested the rate should be tied to the treasury bond rate beginning in 2005, for which RSM calculated a 2.93% average interest rate. Using that amount, RSM calculated interest in the amount of $837,000.

RSM felt that the best way to calculate the Section 736 interest would be to use the actual return on domestic fixed income investments. Fitzgerald testified that RSM could have calculated the Section 736 interest using this rate, but the only rates of return that GERS provided RSM were in aggregate. A domestic fixed income rate of return would be a subset of the assets held by GERS. In the absence of an actual rate of return, RSM believed the 10-year Treasury bond rate was the most appropriate rate for calculating the Section 736 interest.

After Fitzgerald's testimony, the Court heard argument from the parties. During that argument, the parties' description of their practices made it clear that GERS did not submit to the GVI a "Benefits Division invoice" within the meaning of Section 704. Accordingly, the Court held that Section 704's 1% delinquency assessment was not available for GERS. With respect to both Section 704's 1.5% delinquency assessment and Section 736's interest assessment, the Court held that neither was waivable by the Court and were appropriately assessed against the GVI. To that end, the Court directed RSM to file a written

report detailing its calculations with respect to the amounts owed under those provisions.

On March 10, 2020, GERS filed a motion to supplement the record with evidence which GERS characterizes as "GERS' fixed income returns compared to . . . Barclay's Index, a respected benchmark used by retirement systems to measure relative performance of a fixed income asset allocation." *See* ECF No. 237 at 1. Attached to that motion was an affidavit from the GERS's Investment Analyst and a chart depicting GERS's domestic fixed income returns for the period of January 1, 2000, through December 31, 2019.

The GVI opposes GERS's motion to supplement. The GVI argues that this information is "unreasonably late" and that "it would be unfair to accept GERS's affidavit without allowing GVI an opportunity to cross-examine GERS and allowing . . . RSM to review the documents as well." ECF No. 239 at 4. The GVI also argues that any interest is barred by the statute of limitations and laches.

On March 10, 2020, RSM filed a report on the interest accrued for the 2010-2018 period. On March 11, 2020, RSM filed an amended report. Under Section 704, RSM calculated interest in the amount of $5,134,903 for Section 704's 1.5% delinquency

assessment. Under Section 736, RSM provided three calculations.[2]

Using the Variable Daily 10-Year Treasury Rate, RSM calculated

$653,727. Using the Domestic Fixed Income Performance data

provided by GERS on March 10, 2020, RSM calculated $986,370.

Using a fixed 6% rate of interest, RSM calculated $1,711,634.

On March 17, 2020, RSM filed a report detailing its

calculations for missing GVI payments during the 1991-2009

period (the "1991-2009 Report").[3] RSM explained that it

"follow[ed] a three-step methodology" to calculate "a reasonable

estimate" of GVI's missing employer contributions. RSM outlined

its methodology as follows:

> **1. Step 1: Accepted Pensionable Wage Amounts:** We
> assumed that Pensionable Wages, as reported within
> GVI's Annual FMS Payroll Reports, were properly
> calculated by GVI for approximately 83% (40,621 of
> 49,078) of the Employee Years we analyzed. 8 See
> Section VII.B for further detail.
>
> **2. Step 2: Rejected Pensionable Wage Amounts:** We
> determined that Pensionable Wages were likely not
> reported accurately for 17% (8,457 of 49,078) of the
> Employee Years we analyzed. RSM therefore relied
> upon the following assumptions and calculations to
> estimate an expected salary amount for 1,029

---

[2] RSM provided calculations of Section 736 interest using simple and daily-compounded interest. The parties have since agreed that simple interest is appropriate.

[3] The GVI objected to RSM's report on March 19, 2020. The GVI argued, among other things, that Section 704(q) was enacted on November 1, 2005, but that RSM's interest calculations did not reflect this. On March 20, 2020, the Court held a status conference with the parties and RSM and directed RSM to file an amended report that calculated Section 704(q) interest only after the enactment date of that provision. RSM filed an amended report later that day.

Employee Years (due to the absence of detailed payroll records):

(i) We assumed that the GVI's Notice of Personnel Action forms ("NOPAs"), containing each employee's expected annual base wages, and/or the GVI's reported salary information, is complete, accurate and reliable (utilized for 124 employees, see Section VII.C).

(ii) In certain instances where NOPAs were unavailable, RSM utilized Annual Benefit Summaries provided by GERS to determine the employee's expected annual base wages. We assumed that this reported salary information is also complete, accurate and reliable (utilized for 44 employees, see Section VII.C).

**3. Step 3: Application of Statistical Sampling:** We then calculated an estimated adjusted Pensionable Wage amount (utilized for 7,428 Employee Years, relating to 3,312 employees). The adjusted Pensionable Wages were calculated based on the result from our statistical sampling of approximately 80 employees. We applied an adjustment to the FMS Pensionable Wage amount based upon the calculated ratio between a) the average ratio of Pensionable Wages identified within supporting documents and b) the gross wages reported in Annual FMS Payroll Reports. See Section VII.D for further detail.

ECF No. 246, Ex. 1 at 3. Utilizing this method, RSM calculated a low estimate of $11,580,334 and a high estimate of $15,763,156. The stratified statistical midpoint is $13,860,879.

RSM also calculated several permutations of Section 704 and Section 736 interest on the range of amounts potentially owed by GERS. For both Section 704 and Section 736, RSM calculated interest owed with and without a statute of limitations bar and with and without the pre-November 2005 amounts included as

principal beginning on November 2, 2005. For Section 736, RSM

also calculated interest using both the 10-Year Treasury yields

and GERS's rate of return on fixed income investment. These

calculations yield a combined Section 704 and Section 736

interest amount of $770,807 on the low end and $48,971,835 on

the high end.

On March 19, 2020, the GVI filed an objection to the 1991-

2009 Report. The GVI argues that the 1991-2009 Report is

unreliable because RSM relied extensively on NOPAs, which RSM

had previously found to be poor source of data. The GVI also

argues that interest is barred by the statute of limitations and

laches.

## II. DISCUSSION

### A. Unpaid Contributions for 1991-2009 Period

A Notice of Personnel Action form ("NOPA") is a form the

GVI uses to document changes in the employment status of each

GVI employee. GERS relies on NOPAs to determine the amount of

employer and employee contributions that the GVI must remit to

GERS.

In the 2010-2018 Report, RSM noted that, upon review of the

available records, "NOPA history does not accurately serve as a

proxy for 'compensation.'" ECF No. 217 at 9. RSM explained:

Based upon our analysis of Annual Benefit Statements provide[d] by GERS, as well as discussions with management of GERS, it appears GERS calculates expected contributions using NOPAs, both in internal documents as well as [in calculating the] GERS Claim. The formula utilized appears to be:

*Annual Salary x Number of Years Worked x Contribution Rate = Expected Contributions*

RSM observed two types of inaccuracies resulting from GERS's reliance upon NOPAs to determine expected contributions:

a) employees actual hours worked may differ from hours contemplated in NOPAs, and b) employee's actual start and end dates may differ from dates included within NOPAs. Further detailed explanation of each are as follows: a. GERS utilizes NOPA salary information to calculate its GERS Claim rather than actual payroll. As a hypothetical example, if the following occurred:

i.  An employee has a hiring NOPA dated January 1, 2017 documenting a full-time annual salary of $50,000
ii. The employee has no subsequent NOPA on file
iii. The employee took a 2-month unpaid leave of absence then GERS Claim ($50,000 multiplied by the applicable contribution rate to determine "expected contributions") would be 16.67% (1/6th) overstated for calendar year 2017. A similar hypothetical example would result in the same overstatement for other missing hours (unpaid sick leave, suspensions, or other shortages of hours worked).

b. GERS utilizes NOPA start dates to determine the expected commencement of an employee's GERS contributions. As a hypothetical example, if an employee's NOPA states that they will begin employment on January 1, 2017, however, due to administrative backlog, budget issues and scheduling of employee onboarding, the employee does not begin work until February 1, 2017, then GERS Claim would

> be overstated by 8.3% (i.e., one month) for calendar
> year 2017. We observed this issue in one of the ten
> GERS Selections. This issue results in an overstated
> GERS Claim.

*Id.* at 9-10 (footnote omitted).

In the 1991-2009 Report, RSM utilized NOPAs in the
calculation of the GVI's required employer contributions. RSM
did not rely solely on data maintained by GERS. Rather, RSM
employed a robust methodology to improve accuracy and increase
its statistical level of confidence in the data underpinning
RSM's report. Indeed, among other things, RSM sourced its NOPA
data directly from the GVI--the entity generating the NOPA.
Additionally, to validate and test reliability, RSM tested NOPA
data against other sources of information.

Notwithstanding RSM's robust methodology, the GVI argues
that RSM's earlier dismissal of NOPAs as an unreliable source of
data renders the 1991-2009 Report unreliable and inadmissible
under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 136
(1997). The GVI's argument is wanting for several reasons. First,
as discussed above, RSM did not rely solely on GERS's data.
Moreover, the methodology employed by RSM was designed to
mitigate the problems with relying exclusively on NOPA data.
Second, the Court is satisfied that RSM's opinion is consistent

with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 136

(1997).

The admissibility of expert testimony is governed by

Federal Rule of Evidence 702 ("Rule 702"), which provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if
> (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has
> applied the principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579, 593-94 (1993), the Supreme Court explained the trial

judge's "gatekeeper function" in assessing the reliability and

relevance of expert testimony and identified factors a trial

judge should consider when faced with a pre-trial evaluation of

expert testimony. The *Daubert* Court explained:

> The inquiry envisioned by Rule 702 is, we emphasize,
> a flexible one. Its overarching subject is the
> scientific validity and thus the evidentiary
> relevance and reliability — of the principles that
> underlie a proposed submission. The focus, of
> course, must be solely *on principles and
> methodology*, not on the conclusions that they
> generate.

*Id.* at 594-95 (emphasis added).

In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), the
Supreme Court held that the trial judge's gatekeeper function
included review of not only testimony based on "scientific"
knowledge, but also testimony based on "technical" and "other
specialized" knowledge. *Id.* at 141. The trial court's objective
in this capacity is "to ensure the reliability and relevancy of
expert testimony." *Id.* at 152.

Proposed expert witness must meet three requirements:
"qualification, reliability, and fit." *Schneider v. Fried,* 320
F.3d 396, 405 (3d Cir.2003); *Elcock v. Kmart Corp.,* 233 F.3d
734, 741 (3d Cir.2000). There is no question that RSM is
qualified to offer an expert opinion or that it's opinion is
relevant and would assist the Court in determining the amount of
missing GVI payments.

To satisfy the reliability requirement, "the expert's
opinion must be based on the 'methods and procedures of science'
rather than on 'subjective belief or unsupported speculation';
the expert must have 'good grounds' for his or her
belief." *Paoli II,* 35 F.3d at 742 (quoting *Daubert,* 509 U.S. at
590). In evaluating reliability, a trial court may consider
several factors, including

> (1) whether a method consists of a testable
> hypothesis; (2) whether the method has been subject
> to peer review; (3) the known or potential rate of

> error; (4) the existence and maintenance of
> standards controlling the technique's operation;
> (5) whether the method is generally accepted; (6)
> the relationship of the technique to methods which
> have been established to be reliable; (7) the
> qualifications of the expert witness testifying
> based on the methodology; and (8) the non-judicial
> uses to which the method has been put.

*Pineda v. Ford Motor Co.*, 520 F.3d 237, 247-48 (3d Cir. 2008).

Daubert is a flexible inquiry, and especially in the context of

experts with technical or other specialized knowledge, these

"factors neither necessarily nor exclusively appl[y] to all

experts or in every case." *Kumho Tire Co.* 526 U.S. at 142.

In the 1991-2009 Report, RSM acknowledges that NOPAs are an

imperfect measure of an employee's actual compensation, but

avers that the "three-step methodology" used by RSM to calculate

GVI's unpaid obligations "mitigates the risk of using employee

NOPA history as a proxy for 'compensation'" because the

methodology "is informed and limited by an employee's actual

gross wages." ECF No. at 16. RSM explains:

> While NOPAs and/or salary information, when relied
> upon independently from payroll records, do not
> accurately serve as a proxy for "compensation", when
> combined with additional sources of information they
> can be informative. As such NOPAs and salary
> information, used to assist RSM in estimating
> pensionable wages (for 17% of the employee years),
> were not the sole source of information in our
> quantification of pensionable compensation amounts.
> Specifically, in no instances did RSM's annual
> pensionable wage estimates exceed the gross wage
> amounts as reported by FMS's payroll system. For

example, if an employee's gross wages, as reported
by FMS's payroll system, were $42,000 and our review
of available NOPAs or GERS annual benefit summaries
indicated that the employee's expected salary was
$52,000, our model limited pensionable wages to the
gross wages of $42,000. Further, a sample of ten
employees with both sets of records indicated that
the salary reported on GERS' records was, on average
within 4% of the amount reported on the GVI reports.
We are therefore reasonably comfortable relying on
NOPA's as well as GERS records in instances in which
the GVI was unable to provide personnel records of
its employees.

*Id.*

The GVI and GERS have maintained poor records over the
years, and as a result, RSM has been forced to rely on imperfect
data and an incomplete record. This, of course, was the very
reason the Court felt compelled to seek the services of an
expert in this case. This is not problematic under *Daubert*.
"While expert opinions 'must be based on facts which enable [the
expert] to express a reasonably accurate conclusion as opposed
to conjecture or speculation, absolute certainty is not
required.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th
Cir. 2003) (alterations omitted) (quoting *Gomez v. Martin
Marietta Corp.,* 50 F.3d 1511, 1519 (10th Cir.1995)).

The Court has previously found RSM's methodology in dealing
with the GVI's and GERS's record-keeping shortfalls to be well-
documented, well-thought-out, and reliable. Likewise, RSM's

calculated and cautious use of NOPA data in the 1991-2009 Report

was part of a reliable methodology that satisfies *Daubert*.[4]

Accordingly, the Court finds the calculations that resulted

from this methodology to be persuasive. Further, the Court finds

that during the period of January 1, 1991, through December 31,

2009, the GVI failed to pay to GERS $13,860,879 in employer

contributions--the stratified statistical midpoint of RSM's

estimate in the 1991-2009 Report.

## B. Interest on Unpaid Contributions

Two provisions impose penalties on the GVI for untimely

contributions to GERS: Section 704(q) and Section 736.

Section 704(q) provides:

> Retirement contributions paid for a prior period,
> whether by employer or by member, must be charged a
> delinquent fee of 1.5% for each calendar month or
> part thereof that paid contributions should have
> been paid. . . . This delinquent assessment may not
> be waived. If the delinquent assessment is not
> remitted within thirty days following the Benefits
> Division invoice, an additional delinquent
> assessment of 1.0% on the invoice amount shall be
> assessed for each calendar month or part thereof that
> the invoice is delinquent.

---

[4] It is worth noting that the process through which the RSM report was
generated was entirely transparent. The Court required the parties and RSM to
share data and methodological approaches at every step to obviate the very
objection the GVI now raises. The GVI was a valuable and active participant
in that process. The objection now prosecuted by the GVI seems more
invigorated by the outcome than the RSM process.

3 V.I.C. § 704(q). Section 704(r) provides:

> Retirement contributions not remitted timely as prescribed by this chapter are delinquent, unless at the opinion of the Administrator, exceptional circumstances beyond the employer's control prevented payment by the prescribed due date and a waiver of the delinquent fee is granted by the Administrator. A waiver may be granted only once for an employer during any one fiscal year. The employer shall pay the assessed delinquent fee, plus any additional delinquent charges that have accumulated during the time required to renew the request for a waiver of the delinquency charge.

3 V.I.C. § 704(r).

Section 736 provides:

> (a) Neither the government nor any agency, department, or instrumentality may fail or refuse to pay the employer's contribution required by this chapter within the applicable time limitation.

> (b) Whenever any agency, department[,] instrumentality, or employer fails to make timely contributions, interest shall accrue on the amount of the contributions not paid based on the system's domestic fixed income investment rate of return not to exceed the rate of 9%.

3 V.I.C. § 736.

The GVI raises several arguments with respect to interest on its unpaid contributions: (1) that the Court should waive interest; (2) that some or all of the interest is barred by the statute of limitations; (3) that some or all of the interest is barred by laches; (4) that the Court must disregard the GERS's evidence regarding actual return of domestic fixed income

investments; and (5) that any contributions owed prior to the
enactment of Section 704(q) and Section 736 must be excluded
from the principal in calculating interest. The Court addresses
these arguments in turn.

### 1. Waiver of Interest

Section 704(q) plainly states that untimely contributions
"must be charged a delinquent fee" and that "[t]his delinquent
assessment may not be waived." *See* 3 V.I.C. § 704(q). To be
sure, the very next subsection, Section 704(r), provides that
the Administrator of GERS may grant "a waiver of the delinquent
fee" under certain circumstances and thereby render a late
payment non-delinquent. *See* 3 V.I.C. § 704(r).

The GVI's reliance on Section 704(r) is misplaced for
several reasons. Here, the Administrator of GERS has granted no
waivers for any fees the GVI may owe.

Undeterred, the GVI argues that, "[i]f the GERS
Administrator has the power to waive the delinquent fee,
certainly the Court has the same ability as it exercises its
equitable jurisdiction." *See* ECF No. 227 at 5.

Section 704(r) limits the waiver of delinquent fees to only
those instances where "exceptional circumstances beyond the
employer's control prevented payment by the prescribed due
date." *See* 3 V.I.C. § 704(r). The GVI argues that the

"exceptional circumstances beyond [its] control" that prevented

it from making timely contributions were that GERS did not

discover any missing employer contributions until 2012, that the

unpaid contributions were "extremely challenging to quantify,"

and that the GERS estimate of unpaid contributions "was

overstated by 566%." *See* ECF No. 227 at 4. The GVI argument is

unavailing. Indeed, among other things, the GVI generates a

NOPA, which at the very least, could serve as a baseline

datapoint for calculating contributions. Assuming that the Court

could itself waive the delinquent fees, the Court finds that

these are not circumstances beyond the GVI's control that

prevented timely contributions.

In sum, the GVI invites the Court to embark on a journey,

for which the GVI cites no authority, to waive a statutorily

imposed interest obligation. The Court will decline the GVI's

invitation to rule in a manner unsupported by law and clearly

contrary to law.

The other penalty provision, Section 736, provides that

"interest *shall* accrue" on untimely contributions. *See* 3 V.I.C.

§ 736(b) (emphasis added). Unlike Section 704, Section 736 does

not explicitly prohibit waiving this interest or provide an

avenue through which it may be waived.

The GVI argues that unless the interest in Section 736 is waivable, the explicit ban on waivers in Section 704(q) is surplusage. The explicit ban on waivers in Section 704(q) is, however, disclaimed in the following subsection, and as such, is already surplusage.

The Court finds more significant the fact that, while both provisions use the mandatory language of "must" or "shall," *see* 3 V.I.C. §§ 704(q), 736(b), only Section 704(q) provides an avenue by which the required result may be avoided, *see* 3 V.I.C. § 704(r). Accordingly, the Court will give the plain meaning of Section 736 the effect it calls for: the accrual of interest on the GVI's untimely contributions to GERS.

## 2. Statute of Limitations

The GVI argues that the vast majority of untimely contributions in this matter are not subject to interest because the payments were made outside of the two-year statute of limitations in 5 V.I.C. § 31(5)(B) ("Section 31(5)(B)"). The Court is not persuaded by the GVI's argument.

Statutes of limitation address the time within which an action must be commenced after the action accrues. *See, e.g.*, *Gov't of Virgin Islands v. United Indus.*, 64 V.I. 312, 323 (2016). Statutes of limitation do not address the time within which a judgment must be enforced. *See Brennan v. Nassau Cty.*,

352 F.3d 60, 62-63 (2d Cir. 2003) (holding that "consent decrees are subject to equitable defenses and not legal defenses such as the statute of limitations"); *see also Bergmann v. Michigan State Transp. Comm'n*, 665 F.3d 681, 684 (6th Cir. 2011) (holding that equitable doctrine of laches, not state statute of limitations, governed timeliness of motion to enforce consent decree).

The matter before the Court is a motion to enforce a consent decree. As such, its timeliness is governed by laches, not the statute of limitations.

### 3. Laches

Analogous to a statute of limitations, the defense of laches aims to prevent the inequitable enforcement of stale claims. *See Gruca v. U.S. Steel Corp.*, 495 F.2d 1252, 1258-59 (3d Cir. 1974). Laches "consists of two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay." *Univ. of Pittsburgh v. Champion Prod. Inc.*, 686 F.2d 1040, 1044 (3d Cir. 1982).

As a general rule, a sovereign "is not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign government to enforce a public right, or to assert a public

interest" unless that immunity is expressly waived. *Dole v.*

*Local 427, Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO*,

894 F.2d 607, 612 (3d Cir. 1990) (emphasis omitted) (quoting ).

The purpose of exempting sovereigns from the defense of laches

and the operation of statutes of limitations is to further "the

great public policy of preserving the public rights, revenues,

and property from injury and loss, by the negligence of public

officers." *Guar. Tr. Co. of New York v. United States*, 304 U.S.

126, 132 (1938) (quoting *United States v. Hoar*, 26 F. Cas. 329,

330 (C.C.D. Mass. 1821)). The furtherance of this policy

requires the application of this immunity to both government

agencies and government corporations in appropriate

circumstances. *See Entergy Mississippi, Inc. v. N.L.R.B.*, 810

F.3d 287, 298 (5th Cir. 2015) (explaining that "the United

States and its agencies are not subject to the defense of laches

when enforcing a public right"); *United States v. 93 Court*

*Corp.*, 350 F.2d 386, 388-89 (2d Cir. 1965) ("We believe the

policy underlying this exemption to be generally salutary and we

decline to hold that Congress must specifically endow

each government corporation it creates with an expressed

exemption from the bar of statutes of limitations or from the

defense of laches.").

While the Virgin Islands is not a state "the Revised
Organic Act has conferred upon it attributes of autonomy similar
to those of a sovereign government or a state." *In re Hooper's
Estate*, 359 F.2d 569, 578 (3d Cir. 1966). For this reason, the
Third Circuit has held that "the general principle that claims
of the sovereign are not subject to the defenses of laches and
the statute of limitations, is applicable to the Territory,
unless expressly waived, and is implied in all its enactments."
*Id.*

GERS is "a retirement and benefit system for officials and
employees of the [GVI]." 3 V.I.C. § 701(a). GERS operates with
"the powers and privileges of a corporation, subject . . . to
the control of the Board of Trustees," 3 V.I.C. § 701(c), whose
members are appointed by the Governor of the Virgin Islands, 3
V.I.C § 715(a). The GVI defines GERS as "an independent and
separate agency of the [GVI]." 3 V.I.C. § 715(a). Whether
defined as a government corporation or government agency,
*compare Gov't Employees Ret. Sys. v. Governor Juan F. Luis Hosp.
& Med. Ctr.*, No. SX-16-CV-346, 2016 WL 5791256, at *1 (V.I.
Super. Aug. 29, 2016) (defining GERS as "an agency created by
the Virgin Islands Legislature") *with Employees' Ret. Sys. of
Gov't of Virgin Islands v. Gov't of Virgin Islands*, No. CIV. 80-
355, 1983 WL 889443, at *1 (D.V.I. Apr. 28, 1983) (identifying

GERS as a "government corporation"), GERS is not subject to the defense of laches.

"[A] narrow exception" to the exemption of a sovereign's action from laches is "when such actions do not assert any public interest, title or property." *Dole v. Local 427, Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO*, 894 F.2d 607, 612 (3d Cir. 1990). Such a circumstance occurs when "the government, although a *nominal complainant party,* has *no real interest* in the litigation, but has allowed his name to be used therein for the *sole benefit of a private person*." *Id.* (quoting *U.S. v. Beebe,* 127 U.S. 338, 347 (1888).

In *Local 427*, the United States Secretary of Labor brought an action under the Labor-Management Reporting and Disclosure Act (the "LMRDA") to "enjoin a local union from refusing to permit one of its members to review collective bargaining agreements between the union and employers other than her own." *Id.* at 608. The union argued that the Secretary of Labor's suit was barred by the statute of limitations. *Id.* at 609. The Third Circuit held that the statute of limitations did not apply in the action because it was brought to enforce a pubic right. *Id.* at 616.

While LMRDA suits "frequently have specific private as well as public beneficiaries, the touchstone remains the fact that

public policies are served and the public interest is advanced
by the litigation, and the fact that the litigation has private
beneficiaries as well does not detract from the public nature of
the suit." *Id.* at 612. The LMRDA was enacted "to curb 'breaches
of trust, corruption, and disregard of the rights of individual
employees' in the American labor movement. *Id.* at 613
(alterations omitted) (quoting 29 U.S.C. § 401(b)). To "avert
these abuses" the LMRDA "expose[d] union operations to the
scrutiny of union members and the public" by "requir[ing] unions
and union officers to disclose a variety of financial and other
information concerning union activity." *Id.* By bringing its
action on behalf of the employee in that case, the Secretary of
Labor was attempting to do just that. *Id.*

GERS was created "to encourage qualified personnel to enter
and remain in the service of the Government of the United States
Virgin Islands" by establishing a retirement system that would
provide pensions for retired government workers. 3 V.I.C. §
701(b). The Virgin Islands legislature intended that this system
would both "promot[e] [the] economy" and "promot[e] . . .
efficiency in the administration of government." *Id.* To that
end, the Legislature provided for the funding of GERS through
GVI and employer contributions along with two provisions--

Section 704(q) and Section 736--that imposed penalties on the
GVI to ensure contributions were timely made.

GERS brought this action in 1981 and alleged that the GVI
was failing to make statutorily required contributions, which
combined with the loss of interest on those contributions, made
it difficult for GERS "to provide continuous earning capacity
and benefits to members of the Retirement System." ECF No. 47,
Ex. 1 at 3. The motion to enforce at issue presently was filed
because GERS believed the GVI's failure to adequately fund GERS
as required by Section 704 would lead to "insolvency by 2023."
ECF No. 2 at 1. Such an occurrence would severely hamper the
Virgin Islands Legislature's intent that GERS "promot[e] [the]
economy" and "promot[e] . . . efficiency in the administration
of government." 3 V.I.C. § 701(b). An insolvent retirement
system would do little to help the economy and could hardly be
expected to attract new government employees. In this light, the
Court holds that GERS's motion to enforce asserts a public
interest, and as such, GERS is not subject to the defense of
laches.

### 4. Motion to Supplement

On March 9, 2020, the Court held a hearing addressing,
among other things, the appropriate rate of interest to impose

under Section 736, which provides for interest "based on the system's domestic fixed income investment rate of return." 3 V.I. C. § 736(b). At that hearing, a representative from RSM testified that GERS had provided RSM with data on rates of return, but that these numbers were in aggregate, and not a true domestic fixed income rate of return. The next day, RSM filed a motion to supplement the record with an affidavit from the GERS's Investment Analyst attesting to GERS's fixed income returns.

The GVI opposes GERS's motion to supplement. The GVI argues that GERS's motion to supplement was "unreasonably late" and that "it would be unfair to accept the GERS's [proposed evidence] without allowing GVI an opportunity to cross-examine GERS." ECF No. 239 at 4. The GVI does not cite a legal basis for denying the GERS's motion to supplement. Rather, it appears that the GVI is arguing that the Court should sanction GERS by excluding the evidence GERS seeks to introduce.

The Court sees no reason to impose sanctions on GERS under these circumstances. There was no order of the Court with which GERS failed to comply. The GVI points to no evidence that the timing of GERS's submission was motivated by bad faith of any sort.

Further, while the GVI has asked for an opportunity to cross-examine GERS's affiant, the GVI has provided no contrary evidence or given the Court any reason to doubt GERS's evidence. The Court finds that a hearing on this issue is unnecessary, see *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 209 (3d Cir. 2003) (affirming district court's decision not to hold evidentiary hearing where "[t]he Settling Parties produced an extensive documentary record to support their joint motion" and the opposing parties "presented no competing documents, testimony, or analysis" and "merely contested the Settling Parties' evidence as insufficient and replete with errors"), and will accordingly grant the GERS's motion to supplement.

RSM previously testified that the actual return on domestic fixed income investments--evidence of which was the subject of the GERS's motion to supplement--was the best way to calculate Section 736 interest. The Court agrees, and will adopt the appropriate RSM calculations that utilize that rate.

5. **Exclusion of Contributions Owed Prior to the Enactment of Section 704(q) and Section 736 from the Principal**

To determine whether a statute has retroactive effect, the Virgin Islands Supreme Court utilizes the two-part test articulated by the United States Supreme Court in *Landgraf v.*

*USI Film Products*, 511 U.S. 244 (1994). *See Drayton v. Drayton*,

65 V.I. 325, 334-35 ( 2016). Under that test,

> [w]hen a case implicates a . . . statute enacted
> after the events in suit, the court's first task is
> to determine whether [the legislature] has expressly
> prescribed the statute's proper reach. If [the
> legislature] has done so, of course, there is no need
> to resort to judicial default rules. When, however,
> the statute contains no such express command, the
> court must determine whether the new statute would
> have retroactive effect, *i.e.*, whether it would
> impair rights a party possessed when he acted,
> increase a party's liability for past conduct, or
> impose new duties with respect to transactions
> already completed. If the statute would operate
> retroactively, our traditional presumption teaches
> that it does not govern absent clear [legislative]
> intent favoring such a result.

*Landgraf*, 511 U.S. at 280.

Section 704(q) and Section 736 were enacted on November 2,

2005. *See* 2005 V.I. Sess. Laws 6794, §§ 3, 24. There is no

express indication that the legislature intended either law to

be applied prospectively or retroactively. Accordingly, the next

step in the Court's analysis is to determine whether Section

704(q) and Section 736 have retroactive effect as applied here.

Section 704(q) and Section 736 require the GVI to pay

interest on overdue contributions to GERS. The parties agree

that interest should not accrue on any unpaid contributions

during the period prior to November 2, 2005. The GVI goes one

step further and argues that it should not be required to pay

any interest at all on contributions predating November 2, 2005.

Significantly, "[a] statute does not operate

'retrospectively' merely because it is applied in a case arising

from conduct antedating the statute's enactment or upsets

expectations based in prior law. Rather, the court must

ask whether the new provision attaches new legal consequences to

events *completed* before its enactment." *Landgraf*, 511 U.S. at

269-70 (emphasis added).

In *Shook & Fletcher Insulation Co. v. Cent. Rigging &
Contracting Corp.*, 684 F.2d 1383 (11th Cir. 1982), the trial

court entered a monetary judgment against the defendant in a

diversity action proceeding in Georgia. *Id.* at 1384-85. At the

time, the relevant state statute provided for 7% post-judgment

interest. *Id.* at 1388. Sometime after judgment was entered, the

post-judgment interest statute was amended. Effective July 1,

1980, the rate was raised to 12%. *Id.* In response to the

plaintiff seeking an increase of post-judgment interest, the

district court held that applying the 12% post-judgment interest

rate after July 1, 1980, would have an impermissible retroactive

effect. The defendant was only required to pay the 7% interest

after July 1, 1980. *Id.* at 1389. On appeal, the Eleventh Circuit

reversed. *Id.*

Georgia law defines a retroactive law as one that "creates
a new obligation on transactions or considerations already past,
or destroys or impairs vested rights." *Id.* (quoting *Williams
Bros. Lumber v. Anderson*, 78 S.E.2d 612, 617 (Ga. 1953)). A law
is not retroactive merely because "it relates to antecedent
facts." *Id.* (quoting *Williams Bros. Lumber*, 78 S.E.2d at 617).
Applying that law, the Eleventh Circuit held that the 12%
interest rate should have applied beginning on July 1, 1980. *Id.*

> [The defendant] has no vested right to a continued
> 7% rate of interest on judgments entered against it;
> this rate of interest is a creature of statute, not
> contract. The statute imposed an obligation to pay
> 7% annual interest for every day the judgment
> remained unsatisfied until July 1, 1980. On that
> date, a new statutory obligation to pay 12% interest
> was created to apply henceforth for every day that
> the judgment remained unpaid. [The defendant]'s
> obligation to pay interest at an annual rate of 12%
> for the day of July 1, 1980, for example, was not
> incurred as of the date of judgment by virtue of the
> judgment, but rather as of July 1, 1980, by virtue
> of not having paid the judgment by that date. We
> therefore conclude that our construction of the
> statute would not be a retroactive application of
> [the post-judgment interest statute], and that [the
> plaintiff] is entitled as a matter of Georgia law to
> this increased rate of post-judgment interest.

*Id.*

Georgia law on retroactivity mirrors that of the Virgin
Islands. While not binding authority, the Court finds the
Eleventh Circuit's reasoning in *Shook & Fletcher Insulation Co.*
persuasive. Like the defendant's obligation to pay the judgment

in that case, the GVI's obligation to pay GERS here is a
continuing one. The GVI's obligation to pay GERS sums due before
November 2, 2005, did not "end[]" on the day contribution was
due. *See id.* The GVI's debt to GERS was not "complete" on the
day it was incurred. *See Landgraf* at 280. The GVI was obliged to
pay GERS a certain sum of money on November 1, 2005. The GVI was
obliged to pay GERS the same sum the next day. Imposing interest
on that sum beginning November 2, 2005, would not give
retroactive effect to the interest computation. Accordingly, the
Court will adopt the appropriate RSM calculation that includes
the unpaid contributions from January 1, 1991, through November
1, 2005, with interest on that sum commencing on November 2,
2005.

### 6. Appropriate Interest Sum

Applying the above, the interest owed by the GVI for the
2010-2018 Period is $5,134,903 for Section 704(q) interest and
$986,370 in Section 736 interest, for a total of $6,121,273. For
the 1991-2009 Period, the interest owed by the GVI is
$34,954,904 in Section 704(q) interest and $8,206,450 in Section
736 interest, for a total of $43,161,354.

### C. Actuarially Determined Employer Contributions

A final issue that remains to be resolved is whether the Consent Judgment contemplated the ADEC as a component part of the "employee and employer contributions" it requires the GVI to pay GERS. *See Consent J.*, ECF No. 2, Ex.3 at 1.

Courts "discern the scope of a consent decree by examining the language within its four corners." *Harris v. City of Philadelphia*, 137 F.3d 209, 212 (3d Cir. 1998). In determining that scope, a court "must not strain the decree's precise terms or impose other terms in an attempt to reconcile the decree with [the court's] own conception of its purpose." *Id.* That is, "[a] court should interpret a consent decree as written and should not impose terms when the parties did not agree to those terms." *Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 281 (3d Cir. 2001).

"A consent decree is a hybrid of a contract and a court order. A decree embodies the agreement of the parties and as such is in some respects contractual in nature." *Id.* at 277. For this reason, consent decrees should be "interpret[ed] with reference to traditional principles of contract interpretation." *United States v. New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999). Pursuant to those principles, "resort to extrinsic evidence is

permissible, but only when the decree itself is ambiguous." *Id.*
"[A] provision in a decree is ambiguous only when, from an objective standpoint, it is reasonably susceptible to at least two different interpretations." *Id.*

In determining whether a term is ambiguous, context matters, and "circumstances surrounding [a consent decree's] formation are always relevant to its meaning." *Id.* Further, under well-established principles of contract interpretation, "'the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.'" *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.17 (1977) (quoting *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 429-430 (1934)). As such, the Court "presumes that contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached." *Id.*

When the Consent Judgement was entered, Section 718 mandated the following payments:

(1)    "Each employee who is a member of the Government
       Employees Retirement System shall contribute a

percentage of compensation"--the employee

contribution. 3 V.I.C. § 718(b) (1984).

(2)   "The employer shall contribute an amount paid upon a

percentage of employees compensation"--the employer

contribution. 3 V.I.C. § 718(g) (1984).

(3)   "The employer shall make contributions which together

with the members' contributions and the income of the

system will be sufficient to provide adequate

actuarially determined reserve for the annuities and

benefits herein prescribed"--the ADEC. 3 V.I.C. §

718(f) (1984).

With respect to when these payments were due, Section 718

provided that "[t]he employer and employee contributions shall

be paid into the system each payroll period." 3 V.I.C. § 718(h)

(1984). For the payments under Section 718(b) and (g), this

makes sense. Both of these payments are percentages of an

employee's pay. Requiring the GVI to remit this money to GERS

each time an employee is paid seems the most logical payment

schedule and one which is enforceable.

The ADEC was to be based on "[a] computation . . . made annually[5] of the actuarial reserve requirements for the several annuities and benefits provided [by GERS] for members and the beneficiaries for services rendered, and to be rendered, by the members." 3 V.I.C. § 718(e) (1984). Section 718 did not specify when the ADEC was to be made. The Legislature did not require a payment of certain percentages of the ADEC for each pay period as it did with the employer and employee contributions referenced in Section 718(b) and (g).

The disputed portion of the Consent Judgment in this matter reads: The GVI "shall, within thirty (30) days of each payroll period, certify and pay into the Employees' Retirement System Fund the total amount due of employee and employer contributions as defined in Title 3, Section 718." ECF No. 2, Ex. 3 at 1-2. The ADEC is neither determined nor due within thirty days of each payroll period. The ADEC computation was only determined annually. It is hard to conceive how the parties intended an obligation that was only calculated and known once per year to be due, either in whole or in part, 24 times per year.[6] Clearly

---

[5] Section 718(e) has since been amended and currently requires that this computation "be made bi-annually." *See* 3 V.I.C. § 718(e) (2020).

[6] *See* 3 V.I.C. § 562(a) ("The Commissioner of Finance shall pay all salaries of all officials and employees of the Government of the United States Virgin Islands on the basis of 2,080 hours per year, divided into pay periods of

the Consent Judgment did not contemplate payment of an

indeterminate obligation every 30 days.

Indeed, that conclusion is entirely consistent with United

States Supreme Court precedent that recognizes that:

> Consent decrees are entered into by parties to a case
> after careful negotiation has produced agreement on
> their precise terms. The parties waive their right
> to litigate the issues involved in the case and thus
> save themselves the time, expense, and inevitable
> risk of litigation. Naturally, the agreement reached
> normally embodies a compromise; in exchange for the
> saving of cost and elimination of risk, the parties
> each give up something they might have won had they
> proceeded with the litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). Given

this backdrop, the Court finds that, while the negotiated terms

of the Consent Judgment certainly contemplated the payment of

the statutorily determined employer and employee contributions

pursuant to Section 718(b) and (g), they did not contemplate the

payment of the ADEC.

### III. CONCLUSION

At the end of their service to the government, government

employees legitimately expect that their retirement will be

secure and not subject to compromise. To that end, Virgin

Islands law prescribes very specific time sensitive payment

---

86.67 hours each, or 24 pay periods each year payable on the fifteenth day
and the last business day of each month.").

obligations to GERS that must be borne both by the employee and the GVI. To protect the value of those payments, Virgin Islands law outlines specific remedies for any deficiencies. Those remedies serve the salutary purposes of protecting the solvency of GERS and encouraging compliance.

At various times over the course of several decades, the GVI has failed to pay employer and employee contributions into GERS. The cumulative deficiencies and associated interest penalties have exceeded $100 million. To its credit, in recent times, when the GVI has been made aware of its outstanding payments, it has addressed those deficiencies. Indeed, it did so in July of 2018, when after the Court held the GVI in breach of the Consent Judgment, the GVI payed GERS approximately $36 million. It did so again on March 3, 2020, when it paid GERS $5 million when the Court indicated that the GVI was in breach of its payment obligations. That pattern and practice is laudable as it reflects recognition of a key point enshrined in Virgin Islands law with respect to the government employees' retirement funds--the funds are those of GERS, "not those of the Government of the Virgin Islands." 3 V.I.C. § 701(c).

In an effort to determine and remedy any deficiencies in those funds, the parties have hewn close to the Court's directive to cooperate and to proceed in a transparent manner.

The Court is grateful for the parties' efforts in its search for the truth. That search has yielded a deficiency in funds of $63,143,506.

The amount due is not small. The amount owed, however, is necessary to repair and to make the payee whole. It is not a windfall. It is an overdue debt for an injured party. The Court is mindful that relief to the injured party should not be delayed,[7] nor the determination of the amount informed by the defendant's finances.[8] At the same time, the Court is mindful that the exercise of some grace may be appropriate.

In short, the Court has the unenviable task of balancing the need to ensure GVI compliance with the need to make the injured parties--GERS and the untold numbers of government employees--whole and not add insult to injury. Having considered the competing factors, the Court finds that the balance is appropriately reached by requiring the GVI to satisfy its obligation in 7 equal installments occurring every 30 days,

---

[7] *See, e.g., Owens-Corning Fiberglas Corp. v. United States*, 419 F.2d 439, 452 (Ct. Cl. 1969) ("However, it would be unfair indeed for the Government's haste to waste Fenco's and Polytron's time and money. They should be made whole.").

[8] *See, e.g., Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) ("It has been widely held by the courts that have considered the problem that the financial standing of the defendant is inadmissible as evidence in determining the amount of compensatory damages to be awarded.").

beginning May 3, 2020.[9] By this approach, the GVI can continue to do what it has practiced in recent years, securing the retirement benefits of its employees and keeping them free from financial compromise.

There is overwhelming evidence in this case that GERS is on the verge of financial insolvency. That financial calamity, by some estimates, is projected to occur in 2023. Though not quite a road to perdition, in the wake of missing contributions, the journey for many employees has not been easy, as Shoran Sasso, GERS's Director of Member Services testified:

> It is a very emotional thing to listen to individuals tell you that they can't send their children to college. They can't send their children to college. Oh my God, I'm getting emotional. They can't send their children to college. They can't pay their bills. They can't pay their health insurance. They are losing their homes, their cars. It's a really emotional thing on the staff. . . . It's really, really an emotional time in the office for my entire staff and myself.

*Sept. 27, 2018, Hr'g Tr.*, ECF No. 97 at 67:13-25. Restoring the unpaid contributions identified herein gives long serving, long suffering, and understandably anxious government employees several things that they deserve: (1) a demonstratable financial commitment by the GVI to make them whole; (2) hope that they

---

[9] The Court notes that in July of 2018 the GVI agreed to satisfy a payment breach of approximately $36 million breach within 4 months.

will receive their retirement benefits; and (3) hope that the

repository of their retirement funds will be supported.

Recapturing these missing contributions also provides GERS and

the GVI something that they need: an opportunity to forestall

insolvency.

The premises considered, it is hereby

**ORDERED** that GERS's motions to supplement the record

docketed at ECF Numbers 202, 204, 205, and 237 are **GRANTED**; it

is further

**ORDERED** that the GVI's motion for an extension of time to

respond to the 2010-2018 Report is **GRANTED**; it is further

**ORDERED** that the motion of the Government Employee's

Retirement System to enforce judgment docketed at ECF Number 2

is **DENIED** insofar as it seeks the ADEC payments required by 3

V.I.C. § 718(f); it is further

**ORDERED** that the GVI shall pay GERS $6,121,273 in interest

on unpaid employer contributions during the 2010-2018 period; it

is further

**ORDERED** that the GVI shall pay GERS $13,860,879 for unpaid

employer contributions during the 1991-2009 period; it is

further

**ORDERED** that the GVI shall pay GERS $43,161,354 in interest on unpaid employer contributions during the 1991-2009 period; and it is further

**ORDERED** that the GVI shall pay the total obligation of $63,143,506 that is due pursuant to this order in 7 equal installments occurring every 30 days, beginning May 3, 2020.


S\_____
            **Curtis V. Gómez**
            **District Judge**